SEARS, ROEBUCK AND CO.,
and Sunbeam Corporation

v.

Michael MENEGAY and Paula Menegay.

No. 2–94–116–CV.

Court of Appeals of Texas,
Fort Worth.

Aug. 24, 1995.

Rehearing Overruled Sept. 29, 1995.

Tim G. Sralla, James P. Wagner, Fielding, Barrett & Taylor, L.L.P., Fort Worth, for Appellants.

Ken Kraatz, Mike Felber, Wells, Felber, Purcell & Kraatz, Fort Worth, for Appellees.

Before LIVINGSTON, DAUPHINOT and BRIGHAM, JJ.

## OPINION

LIVINGSTON, Justice.

Michael Menegay ("Mike") incurred burns over 27% of his body when a propane tank stored under his gas grill exploded. The gas grill was sold by Sears, Roebuck and Company ("Sears") and manufactured by Sunbeam Corporation ("Sunbeam"). Mike and his wife sued both Sears and Sunbeam on a variety of theories, and the jury returned a verdict in their favor. The jury also found the conduct of Sears and Sunbeam constituted gross negligence. The jury assessed exemplary damages of $140,000 against Sears and $35,000 against Sunbeam. On appeal, Sears and Sunbeam challenge only the award of exemplary damages. We reverse and render the exemplary damage award against Sears and affirm the exemplary damages award against Sunbeam.

In points of error one, two, and three, appellants argue the evidence was legally insufficient to support a finding of gross negligence upon which exemplary damages could be based. Appellants argue in point of error four that it was error for the trial court to admit the video tape deposition testimony of Everett Long ("Long") because appellees failed to establish that the accident Long testified to was reasonably similar to the accident in this case.

## PRIOR ACCIDENTS

■ Before reviewing the legal sufficiency of the evidence under points of error one through three, we will address point of error four regarding the admissibility of Long's deposition. Before evidence of prior accidents can be introduced, the proponents of the evidence must lay a predicate showing that the "earlier accidents occurred under reasonably similar but not necessarily identical circumstances." *Missouri Pac. R.R. Co. v. Cooper*, 563 S.W.2d 233, 236 (Tex.1978). An instructive application of this rule can be found in *Rush v. Bucyrus–Erie Co.*, 646 S.W.2d 298, 301 (Tex.App.—Tyler 1983, writ ref'd n.r.e.).

*Rush* involved a wrongful death suit based on product liability and negligence claims. *Id.* at 299. Wesley Rush was a construction worker assigned to disassemble the boom of a crane manufactured by the Bucyrus–Erie Company. *Id.* While standing under the boom removing the splice pins to disassemble it, the boom fell on Rush and crushed him to death. *Id.* At trial, plaintiffs sought to introduce evidence of the other incident reports of workmen being killed while standing under the boom disassembling it. *Id.* The trial court refused to admit the evidence. *Id.*

The court of appeals reversed the case ordering a new trial because the evidence of other accidents involving workers killed while dismantling similar booms manufactured by the same company with the same type of splice pins was reasonably similar to the accident being litigated to warrant admission. *Id.* at 301–02. The court in *Rush* noted, "The requisite degree of similarity is plainly not very high." *Id.* at 302 (quoting *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1147 (5th Cir.1978) (citing *Magic Chef, Inc. v. Sibley*, 546 S.W.2d 851, 855 (Tex.Civ.App.—San Antonio 1977, writ ref'd n.r.e.)).

■ In his deposition, Long testified that he received a Sunbeam propane gas grill, model 4477W, for Father's Day in June 1986. Long used the grill many times between the

summer of 1986 and 1987. During this period, Long did not use the fuel tank that came with the new grill; instead, he always used the fuel tank from his old grill.

In July 1987, Long decided to fill and use the new tank that came with the Sunbeam grill. After having the tank filled, Long took it home. Long could smell fuel from the newly filled tank and left the tank outside for several days. When Long checked the tank again by smelling it and using soapy water to detect air bubbles, he determined that the tank was no longer venting.

Long stored the new tank under the left side of his grill. Long put the tank there because "it just seemed like it was an appropriate place." Long's first use of the grill after storing the spare cylinder underneath the grill was on July 19, 1987. Long began grilling around 1:00 or 2:00 in the afternoon, and the temperature outside was around ninety degrees. After the grill had been on for about twenty minutes, Long "heard something poof." He could see a flame between the frame and the pit, and he opened the door underneath the grill. There was a flame coming out of the new tank. Long tried to put the flame out with a squirt can, but the flame leapt out. Long jumped off of the porch and began rolling in the grass. Long was burned on his arms and legs, and he was hospitalized for seven days.

Mike's accident occurred on May 28, 1989, Memorial Day. It was very hot outside. About 6:30 that evening, Mike turned on his grill, a Sunbeam product marketed under the Kenmore name, and preheated the grill for ten to fifteen minutes. He had a spare propane tank stored underneath the grill. Mike's wife, Paula, had experienced problems with one of the canisters venting when she had it filled in April. Based on assurances from the company that filled the canister that it was no longer venting, Mike stored the canister underneath the grill.

After Mike had been cooking about fifteen to twenty minutes, he pronounced dinner was ready, sent his kids inside to wash their hands for dinner, and then "felt the combustion." Mike sustained severe burns on 27% of his body, concentrated on his arms and legs.

We find that this prior accident occurred under reasonably similar circumstances to the accident in question to make Long's testimony admissible. *See Missouri Pac. R.R.,* 563 S.W.2d at 236. Accordingly, appellant's fourth point of error is overruled.

## EXEMPLARY DAMAGES

■ In points of error one, two, and three, appellants challenge the exemplary damage award arguing the evidence is legally insufficient to support the award. In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992). "The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach]." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24 (Tex.1994) (op. on reh'g) (alteration in original) (quoting *Lyons v. Millers Casualty Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993)). There must be a direct or inferential logical connection between the evidence offered and the fact to be proved. *Moriel,* 879 S.W.2d at 24.

■ If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex. 1993). A "no evidence" point of error may only be sustained when the record discloses one of the following: 1) a complete absence of evidence of a vital fact; 2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or 4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex. 1990); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361 (1960).

Appellants claim there is no evidence of gross negligence in this case. "Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. TEX.CIV.PRAC. & REM.CODE ANN. § 41.001(5) (Vernon Supp.1995). It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected. *Id.*

Gross negligence involves two distinct components: 1) an act or omission by the defendant; and 2) the mental state of the defendant. *Moriel*, 879 S.W.2d at 21. The first part, the act or omission, must "involve behavior that endangers the rights, safety, or welfare of the person affected." *Id.* Objectively, the defendant's conduct must involve an act or omission that created an extreme degree of risk. *Id.* at 21–22. "Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff." *Id.* at 22. To support a gross negligence finding, the act or omission must be unjustifiable and likely to cause serious harm. *Id.* Whether or not the act or omission involves an extreme risk must be viewed from defendant's perspective without the benefit of hindsight. *Id.* at 23.

The second part, the mental state, requires a showing that the defendant was subjectively aware of the extreme risk created. *Id.* at 22. The evidence must establish the defendant's actual conscious indifference; merely raising the belief that conscious indifference might be attributable to a hypothetical reasonable defendant is insufficient. *Id.* at 20. "Entire want of care" does not mean that evidence of "some care" automatically precludes a finding of gross negligence; rather, " 'entire want of care' must be understood in the context of the whole [gross negligence] [definition]." *Id.* (second alteration in original) (quoting *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 918 (Tex.1981)). Thus, reviewing courts must look for evidence of the defendant's subjective mental state, rather than the exercise of care, because what lifts ordinary negligence into gross negligence is the attitude of the defendant. *Moriel*, 879 S.W.2d at 20. This subjective mental state may, however, be proven by either direct or circumstantial evidence. *Id.* at 23.

### The Sears/Sunbeam Relationship

In order to review the record for evidence of gross negligence, we must examine the relationship between Sunbeam and Sears with regard to the model 10783 grill. Robin Maurice Johnson ("Johnson") worked for Sunbeam for twenty-four years and was the senior vice-president of sales and marketing for Sunbeam Outdoor Products at the time of trial. Johnson explained the production process of a Sunbeam grill manufactured for Sears.

Discussions about the manufacture of the 1988 Sunbeam models began in January 1987. In approximately May 1987, Sears met with Sunbeam to look over the proposed grills Sunbeam intended to offer to customers. From this line-up, Sears would select grills they were interested in selling, and the grills would be "Kenmorized" for inclusion in the Sears–Kenmore product line.

Generally, a prototype would be finalized in June or July of the same year and would be shown to the Sears merchandising staff. Once the Sears merchandising staff approved the prototype, the Sunbeam engineering department would test the prototype.

The Sunbeam engineering department was responsible for preparing the assembly instructions for the grill. The use and care manual was created separately, however. Because Sears had been in the business of selling gas grills for a number of years, use and care manuals already existed for the Kenmore line.

Thus, instead of starting from scratch on the use and care manual, Sunbeam used the old Kenmore use and care manuals as the basis for the manual for the new Kenmore grill. According to Johnson, Sunbeam reviewed the existing Kenmore use and care manual, submitted it back to Sears with suggestions, and Sears gave the manual final approval.

Billy Joe Duncan ("Duncan") worked for Sunbeam Leisure Products, the division of Sunbeam that manufactured the model 10783 grill for fourteen years. Duncan also testi-

fied that final approval of the use and care manual rested with Sears. Duncan explained that "Sears had their own format, their own standard, and they took care of their own manual as far as the verbiage in the manual."

After Sunbeam's engineering staff completed testing, the grill would go to the American Gas Association ("AGA") for testing and certification. The use and care manual was sent along with the grill to the AGA for testing and certification.[1] The 10783 model was certified in March 1988.

## Knowledge of the Danger

Long, the 1987 accident witness, testified that his daughter reported the accident to the retailer, Wal–Mart, and Long reported it to Sunbeam after he recovered. Long did not testify to the exact date that he reported the accident to Sunbeam, but we know it had to be after July 19, 1987, which is the date of Long's accident. Long testified that a representative he believes to have been from Sunbeam came out to his house to look at the grill and his injuries, but he did not know the name of the person he spoke with when he made the report or the name of the representative who came to his house.

Duncan testified that he was working as head of research and development for Sunbeam Leisure Products in 1987 when the 10783 model grill was developed. His department ran the pretesting on all products that were to be submitted to the AGA for final approval. No testing was done on the 10783 model grill with a spare cylinder stored under the grill prior to certification.

Duncan testified that he believed it was unsafe to store a spare propane tank under the grill because of the temperature the spare tank would be subjected to and the risk of the tanks being overfilled. He stated that Sunbeam knew in 1987 that the risk existed for the spare cylinder to vent, cylinders were being overfilled, and overfilled cylinders created a hazardous condition.

Duncan explained that the problems were known because Sunbeam received reports from consumers who were storing spare cylinders under grills and were experiencing venting. The danger of storing spare cylinders under the grill was discussed at AGA and American National Standards Institute ("ANSI") meetings, which Duncan attended as a representative of Sunbeam. Duncan testified that he "would bring the information back to Sunbeam and distribute it to those people in those departments that the information would apply to." Specifically, Duncan brought back information about the "[d]o not store any spare cylinder under the grill body or in grill enclosure" warning.

Wendell Alan Bullerdiek ("Bullerdiek"), a chemical engineer, testified regarding safety studies of LPG gas grills he conducted in 1986 in conjunction with the United States Consumer Product Safety Commission ("CPSC"). The CPSC's seventh recommendation was to discourage maintaining spare cylinders on equipment carts. The reason for the recommendation was that engineering analysis showed storing a spare cylinder underneath a grill was likely to result in a discharge of gas which could ignite and cause injury.

Bullerdiek indicated that the CPSC was aware of similar accidents occurring and that there were high heat readings on the grill. The study was published and distributed to agencies and people within the industry such as the National LP Gas Association and to the Gas Appliance Manufacturers Association after its completion in 1986. Johnson, a Sunbeam executive, testified that he learned of the Bullerdiek report in December 1987. Bullerdiek believed there was a design defect in the grill in that the design "virtually invite[d]" and allowed the storage of a spare cylinder under the grill body which was a dangerous condition that Sunbeam did or should have known about and did not design against. He also believed there was a marketing design defect in that "[t]here should have been a warning that was very clear and explicit" as to the danger of storing a spare

---

**1.** Duncan explained that the AGA was created in the early 1900's to test and evaluate appliances such as stoves, water heaters, room heaters, and gas grills to make sure they are safe for consumers.

cylinder underneath the grill. Bullerdiek testified that he did not see any evidence that Sears or Sunbeam tried to discourage the use of a spare cylinder, and in fact, Sears encouraged the use of a spare cylinder in their use and care manual.

Bullerdiek's opinion was based in part on the "hierarchy of design." The hierarchy, according to Bullerdiek, sets out the steps engineers should take when reviewing a potential hazard in a product. The steps are to: 1) design the hazard out; 2) try to guard against the hazard with protective mechanisms; and 3) if you can't design it out or guard it out, provide a warning. Bullerdiek testified that the warning against storing flammable vapors or liquids around an appliance was not designed to warn against the storage of spare cylinders. He believed the warnings in the Kenmore use and care manual that accompanied the 1988 models were ineffective to warn against the danger because the point of a warning is to present the material in a way that it is likely to be read, understood, and acted upon. Bullerdiek believed a specific warning against storing a spare cylinder underneath the grill should have been placed on the grill itself where it would have been a visible reminder.

### The Use and Care Manuals

The suggested warning against storing a spare cylinder underneath the grill was incorporated in the Sunbeam's 1987 use and care manual. The front page of the use and care manual of Sunbeam dated November 1987, which would have been provided with all Sunbeam grills marketed in 1988, contains the warning "Do not store any spare L.P. gas propane cylinder under grill body or in grill enclosure." Duncan testified Sunbeam included the warning "[b]ecause of the occurrences of spare cylinders venting on gas grills." Further, according to Duncan, the "form" manual put out by the AGA in November 1987 included the same warnings.

The Kenmore use and care manual which accompanied the grill purchased by the Menegays in 1988, did not contain the cylinder storage warning. The Kenmore use and care manual accompanying the grill provided the following warnings:

FOR YOUR SAFETY: Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.

LOCATION—FOR OUTDOOR USE ONLY

... Do not obstruct the flow of combustion and ventilation air around the grill housing. You must keep appliance clear and free from combustible materials, gasoline and other flammable vapors and liquids.

DO NOT SUBJECT L.P. CYLINDERS TO EXCESSIVE HEAT.

CAUTION: NEVER STORE A L.P. GAS CYLINDER INSIDE A BUILDING OR IN THE VICINITY OF ANY GAS BURNING APPARATUS. BETWEEN COOKOUTS WHEN THE L.P. GAS SUPPLY CYLINDER IS NOT DISCONNECTED FROM THE GAS GRILL, THE CYLINDER AND GRILL MUST BE STORED OUTDOORS IN A WELL VENTILATED AREA. IF FOR ANY REASON THE GAS GRILL IS TO BE STORED INDOORS, THE CYLINDER MUST BE DISCONNECTED AND REMOVED FROM THE GRILL CART AND STORED OUTDOORS IN A WELL VENTILATED AREA.

On page ten of the use and care manual, there is a list of grill accessories which could be purchased from Sears. Accessory number seven was a twenty-pound gas tank. The caption under the tank read, "Keep a spare tank filled and handy." The "Keep a spare cylinder filled and handy" was in the Kenmore use and care manual, and Sunbeam did not object to the language or suggest its removal.

Johnson admitted that Sunbeam did not suggest removing the language because it was common practice for consumers to have a spare cylinder. The Sears representative, David Macarus ("Macarus"), chief engineer of home improvements and hardware for Sears, conceded that the statement "Keep a spare tank filled and handy" was intended to encourage the purchase of a spare cylinder. Mike testified that the Kenmore use and care manual that came with the grill which said

"Keep a spare tank filled and handy" encouraged him to use a second tank.

Mike further testified that he decided to store the second tank under the grill because:

[i]t was very common sense that it was—it already had one there, and if it already had one, it was obviously, in my opinion, a very safe area to put my other grill—I mean my other tank, the other cylinder. And with children, you know, I knew that you didn't put it inside a garage, and I knew you didn't put them, you know, some place where kids could play with it. So I put it under there, because to me it was extremely common sense to put it where another one was.

Johnson testified that Sunbeam did not receive any reports of accidents involving second cylinders stored under the grill prior to the fall of 1987. Johnson did not recall reviewing "the Long accident," but admitted reviewing "the Davis accident" in October 1987.[2] Johnson went to the president of Sunbeam, Tom Welch ("Welch"), and discussed the problem of the spare cylinders being stored under the grill. Welch contacted Lou Uhl, corporate director of product safety, to run spare cylinder testing, and following the test results, Sunbeam issued a press release in May 1988. The press release read in part:

Consumers who own a gas barbecue grill and store a spare propane cylinder near or within the gas grill are creating a serious fire hazard....

Storage of the spare cylinder on the lower shelf of cart-style grills or within the cabinet of enclosed shelf models could result in fires involving property damage and/or personal injuries.

The problem is not limited to any particular make or grill of cylinder and does not involve a product defect. Today's gas grills are very safe when used as the manufacturer suggests ... It is the manner in which the spare cylinder is stored that creates the potential hazard.

Sunbeam also added a warning to its own use and care manual for the 1988 season at

that time. Sunbeam also reviewed the Kenmore use and care manual at that time, but chose not to add the specific warning regarding the storage of spare cylinders because "the Kenmore use and care manual already contained a very strong warning regarding the storage of L.P. gas cylinders."

Although Sears had the final say in what information was placed in the use and care manual, the evidence at trial showed that Sears relied on Sunbeam to advise them on what warnings should be included. Macarus testified that no manufacturer ever told Sears that the AGA was having problems with any of the grills. Further, Johnson admitted that he felt Sears relied on Sunbeam to make recommendations regarding the warnings for the grill.

## ANALYSIS

█ To support a theory of gross negligence, the evidence must show that appellants were "consciously indifferent." *Moriel*, 879 S.W.2d at 25. The question is whether Sears and Sunbeam were actually aware of an extreme risk—some genuine and unjustifiable likelihood of serious harm to the appellees and were consciously indifferent to the risk. *Id.*

█ Our review of the record shows that appellees produced no witnesses who testified that Sears had knowledge of the danger of storing a spare cylinder under the grill at the time the use and care manual for the grill in question was finalized. Further, appellees do not cite any place in the record for their assertion that Sears had knowledge of any prior accidents of this type or of warnings from authorities in the industry. Further, we find no circumstantial evidence, and appellees point to none, which indicates that Sears had actual knowledge of the risk. After reviewing the record in the light most favorable to the verdict for objective evidence that Sears was actually aware that its conduct involved an act or omission that created an extreme degree of risk, we find no evidence in the record, and appellees have cited none, supporting the conclusion that Sears had actual awareness of the risk creat-

---

**2.** Johnson indicated the "Davis incident" report was "pretty clear that it involved a spare tank."

ed by failing to warn consumers about the danger of storing spare cylinders under the grill body. *See Moriel,* 879 S.W.2d at 22. Accordingly, we find the evidence legally insufficient to support a finding of gross negligence against Sears and reverse the exemplary damage award entered against Sears.

Regarding the gross negligence finding against Sunbeam, we first review the record in the light most favorable to the verdict for evidence of an act or omission, that created an extreme degree of risk to appellees. *Id.* at 21–22. First, the record establishes that Sunbeam was aware of the danger of storing a spare cylinder under the grill body, but failed to include or suggest inclusion of a specific warning against this practice in the Kenmore use and care manual. The record shows that Sunbeam was cognizant enough of the hazard to put a warning in their own manual and to issue a press release, yet Sunbeam failed to suggest or push for the inclusion of the warning in the Kenmore use and care manual. Although final decisions on how the Kenmore manual was to read were to be made by Sears, the record supports the conclusion that the Kenmore use and care manual was reviewed by Sunbeam engineers for their suggestions, Sears relied on Sunbeam for information on what should be included in the manual, and Sunbeam was aware of Sears' reliance. Second, Sunbeam was aware of the danger of storing a spare propane cylinder under the grill body, but took no action to "design out" the flaw that made owners view the grill body as the natural place to store the spare. Further, the danger of having a spare cylinder of propane stored under the grill explode while someone was using the grill constituted an extreme degree of risk. This constitutes more than a mere scintilla of evidence supporting the conclusion that Sunbeam's actions created an extreme degree of risk to appellees.

Next we review the record in the light most favorable to the verdict for evidence of appellant's mental state. The record must show that Sunbeam was subjectively aware of the extreme risk created. *Id.* at 22. The record reveals that Sunbeam was aware of the danger of storing spare cylin-

ders under the grill body as early as 1986. Duncan, a Sunbeam employee, testified that he attended meetings of the AGA and ANSI which specifically encouraged the use of warnings against storing spare propane tanks under grills. In addition, Long testified that Sunbeam was alerted to his accident sometime after July 19, 1987, and Sunbeam admitted learning about the "Davis accident." Further evidence of Sunbeam's awareness of the risk of storing spare cylinders is the test results from tests conducted by Sunbeam engineers which prompted the press release. Finally, Johnson, a Sunbeam representative, admitted to learning in December 1987 of the CPSC report advising of the danger of storing spare cylinders. While a review of the record shows that the Sunbeam did review the Kenmore manual and it contained some general warnings about the dangers of storing fuel near heat, a showing of "some care" will not preclude a finding of gross negligence. *Moriel,* 879 S.W.2d at 20. This constitutes more than an scintilla of evidence establishing that Sunbeam knew of the danger of storing a spare cylinder under the grill body, yet chose to warn only purchasers of the Sunbeam grill rather than warning purchasers of the Kenmore grills. We conclude that the evidence was legally sufficient to support a finding of gross negligence against Sunbeam. Accordingly, the judgment of the trial court is reversed and rendered as to Sears and affirmed as to Sunbeam. Sunbeam is ordered to pay one-half of all costs of this appeal, and Mike Menegay and Paula Menegay are ordered to pay one-half of all costs of this appeal.