Colby Rae SANTORO, a minor by her Guardian Ad Litem, her Mother, Diana SANTORO and Diana Santoro, Plaintiffs,

v.

Lewis DONNELLY, Fairview Majestic Fireplace, Corp., and the Vermont Castings Majestic Products Co., Defendants.

No. 02 Civ. 8796(SAS).

United States District Court, S.D. New York.

Sept. 30, 2004.

Robert M. Motta, Alison Reiss, Reiss & Motta, L.L.P., Chicago, IL, for Plaintiffs.

Craig Lamster, Galvano & Xanthakis, P.C., New York, NY, for Defendant/Third–Party Plaintiff Lewis Donnelly.

Jon D. Lichtenstein, Gordon & Silber, P.C., New York, NY, for Vermont Castings Majestic Products Co.

Scott P. Benjamin, Steven R. Sundheim & Assoc., L.L.C., White Plains, NY, for Fairview Majestic Fireplace, Corp.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Colby Rae Santoro ("Colby") and her mother, Diana Santoro ("Santoro") bring this diversity action against Colby's father, Lewis Donnelly; Fairview Majestic Fireplace, Corp. ("Fairview"); and The Vermont Castings Majestic Products Co. ("Vermont"). Colby alleges causes of action for negligence, strict products liability, and breach of warranty arising from a December 2001 accident in which she sustained injuries from touching the glass surface of Donnelly's fireplace heater. Santoro asserts claims for negligent infliction of emotional distress, loss of consortium, and a derivative claim for loss of services and to recover medical expenses, arising from the same accident.[1] Donnelly

---

1. When the original complaint was filed, San- toro did not appear to be a named plaintiff in

brings claims as a third-party plaintiff against Fairview and Vermont for contribution and indemnification, negligence, strict products liability, and breach of warranty.[2] Vermont now moves to preclude the testimony of Donnelly's expert witness, Dr. Robert I. Goldberg, and Colby's expert witness, W. Alan Bullerdiek, and for summary judgment pursuant to Federal Rule of Civil Procedure 56 as against plaintiffs and Santoro.[3] For the reasons that follow, Vermont's motions are granted in part and denied in part.

## I. BACKGROUND

### A. The Parties

Colby Rae Santoro is a three-year-old child bringing this action by and through her natural mother and Guardian ad Litem, Diana Santoro. Colby and Santoro are New Jersey residents.[4] Lewis Donnelly is Colby's natural father and a citizen of New York.[5] Fairview is a corporation organized under the laws of New York, which sells and installs gas fireplaces.[6] Vermont is a manufacturer of gas fireplaces conducting business in New York.[7]

### B. Facts

The following facts are either undisputed or presented in the light most favorable to plaintiffs.

Donnelly owns a general contracting construction company called Ashmar Development ("Ashmar").[8] He has been in the construction business for approximately seven years and learned the trade through hands-on experience.[9] In the past, Fairview has sold and installed wood burning fireplaces in Ashmar-built homes.[10]

Sometime in 2001, Donnelly purchased a house on Ferndale Avenue in Highland Mills, New York. The house was in poor condition when Donnelly bought it, so he undertook extensive renovations to make the house habitable. The work was done mostly by Ashmar contractors and by Donnelly himself. There were no fireplaces in the home when he purchased it. Donnelly wanted to install a gas fireplace because he thought it would be more convenient than a wood burning fireplace as it does not use wood or produce ash.[11]

---

this lawsuit, even though she appeared to be asserting her own claims. Santoro has since remedied the problem by amending the caption to the Amended Complaint ("Am. Compl.").

2. Because Colby and Donnelly assert nearly identical claims, I refer to them collectively as "plaintiffs" for purposes of this motion.

3. Although Vermont has moved for summary judgment on "any and all claims and cross-claims," Vermont does not argue that Donnelly's claims for contribution and indemnification should be dismissed. Vermont's Notice of Motion for Summary Judgment at 1. Therefore, I do not address these claims.

4. See Am. Compl. ¶ 1.

5. See id. ¶ 2; Deposition of Lewis Donnelly ("Donnelly Dep."), Ex. B to Declaration of Jon D. Lichtenstein, counsel for Vermont, in

Support of Motion to Preclude and for Summary Judgment ("Lichtenstein Decl."), at 5.

6. See Am. Compl. ¶¶ F, 3; Deposition of Art Ackert, former President of Fairview ("Ackert Dep."), Ex. D to Lichenstein Decl., at 9.

7. See Am. Compl. ¶¶ D, 4.

8. See Defendant Vermont's Amended Rule 56.1 Statement ("Def. Am. 56.1 Stmt.") ¶ 5; Plaintiffs' Rule 56.1 Statement ("Pl. 56.1 Stmt.") ¶ 5.

9. See Def. Am. 56.1 Stmt. ¶ 6; Pl. 56.1 Stmt. ¶ 6.

10. See Def. Am. 56.1 Stmt. ¶ 7; Pl. 56.1 Stmt. ¶ 7; Donnelly Dep. at 35.

11. See Donnelly Dep. at 8–9, 14, 17, 30, 113.

Ashmar's office manager, Mary Petrillo, contacted Fairview to obtain a gas fireplace for Donnelly's home.[12] When Petrillo placed the order, she gave Fairview the model number for a Vermont-manufactured gas fireplace heater.[13] A fireplace heater has the dual purpose of providing a decorative gas flame to simulate a wood burning fireplace and of heating the room through the combustion of gas.[14] The fireplace heater has a glass front enclosing the flames. Because of their business relationship, Fairview gave Donnelly the fireplace heater free of charge.[15] When the thirty-six inch heater was delivered, Donnelly thought it was too small for the living room and therefore instructed Fairview to install it in his bedroom.[16] Donnelly then purchased a forty-three inch fireplace heater for his living room ("fireplace heater"),[17] which was also sold and installed by Fairview.[18]

Donnelly never read any warnings either in the instruction manual or on the tethered plate located inside the bottom control compartment of the fireplace heater.[19] Nor did he receive any written or verbal instructions as to how to operate the fireplace heater.[20] Nonetheless, Donnelly did not search for an instruction manual because the fireplace heater could be operated with a simple flip of a switch.[21]

Vermont's Installation Instructions and Homeowner's Manual contains the following warning:

Children and adults should be alerted to the hazards of the high surface temperatures of the fireplace and should stay away to avoid burns or ignition of clothing. *Caution, due to high glass surface temperature children should be carefully supervised when they are in the same room as the fireplace.*[22]

The tethered plate inside the fireplace heater reads:

CAUTION: HOT WHILE IN OPERATION. DO NOT TOUCH. SEVERE BURNS MAY RESULT. KEEP CHILDREN, CLOTHING, FURNITURE, GASOLINE AND OTHER LIQUIDS HAVING FLAMMABLE VAPORS AWAY.[23]

On December 22, 2001, Colby, then one year old, sustained burns on her hands, left forearm, and forehead after touching the glass cover of the fireplace heater in Donnelly's living room. The incident oc-

---

12. *See id.* at 21–22; Ackert Dep. at 154.

13. *See* Ackert Dep. at 150–52.

14. *See* Deposition of Don Jamieson, Vermont's Director of Engineering ("Jamieson Dep."), Ex. C to Plaintiffs' Declaration in Opposition to Defendant–Manufacturer's, The Vermont Castings Majestic Products Company, Summary Judgment Motion ("Pl. SJ Opp."), at 69–70.

15. *See* Def. Am. 56.1 Stmt. ¶ 7; Pl. 56.1 Stmt. ¶ 7; Donnelly Dep. at 19, 91.

16. *See* Ackert Dep. at 163; Donnelly Dep. at 23, 270–71.

17. All subsequent references to "the fireplace heater" refer to the fireplace heater in Donnelly's living room, not the one in his bedroom.

18. *See* Def. Am. 56.1 Stmt. ¶ 8; Pl. 56.1 Stmt. ¶ 8; Fairview Invoice, Ex. E to Lichtenstein Decl.

19. *See* Pl. 56.1 Stmt. ¶ 11; Donnelly Dep. at 48, 228, 233.

20. *See* Donnelly Dep. at 27–28.

21. *See id.* at 28; Jamieson Dep. at 126.

22. Vermont's Installation Instructions & Homeowner's Manual ("Vermont Instruction Manual"), Ex. M to Lichtenstein Decl., at 3.

23. Photograph No. 22 attached to Initial Report of W. Alan Bullerdiek ("Bullerdiek Rep."), plaintiffs' expert witness, Ex. L to Lichtenstein Decl. The plate is connected to the heater with a flexible chain. *See* Photograph No. 19 attached to Bullerdiek Rep.

curred during Colby's first visit to Donnelly's house.[24] On the day of the accident, Donnelly was supervising Colby, as well as two eleven-year-old girls—his daughter, Ashley Donnelly and her friend, Brooke Sackaris.[25] As he was unpacking groceries in the kitchen, Ashley asked him for permission to turn on the fireplace heater in the living room.[26] Donnelly consented and told her how to light it.[27] All three children were in the living room while Donnelly was in the kitchen.[28] The fireplace heater was turned on. Within approximately ten minutes, Ashley ran into the kitchen holding Colby, which alerted Donnelly that Colby had been burned.[29]

Donnelly immediately took Colby to the nearest hospital, but she was transferred to Westchester County Medical Center ("WCMC") because it had a child burn unit.[30] Upon being informed of the accident, Santoro met them at WCMC.[31] Colby suffered serious second or third degree burns on both her hands, left forearm, and forehead.[32] To treat the burns, Santoro had to scrub, clean, and bandage Colby's wounds at least twice a day for three months prior to Colby's release from the hospital, and she continued this routine for another month after the release.[33] As part of the procedure, Santoro was required to scrub the burn areas until they bled to ensure that all the dead skin was removed from the damaged areas.[34] Santoro's parents often needed to hold Colby down while Santoro changed the bandages.[35]

Colby was treated by multiple doctors, including an occupational therapist, a pediatrician, and a specialist in Maryland.[36] Santoro also spoke to doctors about Colby's need for skin grafts on her hands and treatment from a child psychiatrist.[37] Since the accident, Colby has suffered from, among other things, nightmares, loss of appetite, aggressiveness, and an obsession with hot and cold.[38]

Donnelly's medical insurance did not pay for many of Colby's treatment costs, and as a result, Santoro has spent almost ten thousand dollars out of pocket for medical treatment.[39] In addition, Santoro was forced to stop working and delay finishing her education by one year in order to care for her daughter.[40]

Colby and Santoro instituted this action against Donnelly on October 2, 2002. Donnelly answered the Complaint and instituted a third-party action against Vermont and Fairview. Colby and Santoro thereafter amended their Complaint to assert claims against Vermont and Fairview, as well.

24. *See* Donnelly Dep. at 175.

25. *See id.* at 36–37.

26. *See id.* at 37.

27. *See id.* at 170.

28. *See id.* at 172, 176.

29. *See id.* at 56, 177.

30. *See id.* at 181, 184.

31. *See* Deposition of Diana Santoro ("Santoro Dep."), Ex. N to Pl. SJ Opp., at 18.

32. *See* Donnelly Dep. at 183; Santoro Dep. at 19–20.

33. *See* Santoro Dep. at 29–31.

34. *See id.* at 29.

35. *See id.* at 111.

36. *See id.* at 30–33, 86–87.

37. *See id.* at 31, 86.

38. *See id.* at 34–35, 37, 41, 43–44; Donnelly Dep. at 278.

39. *See* Santoro Dep. at 57–59.

40. *See id.* at 98, 107.

## II. *DAUBERT* MOTIONS TO EXCLUDE EXPERT TESTIMONY

Vermont moves to exclude the testimony of Donnelly's expert, Dr. Robert I. Goldberg and Colby's expert, W. Alan Bullerdiek.

### A. Legal Standard for Admissibility Under Federal Rule of Evidence 702 and *Daubert*

The proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof.[41]

> Federal Rule of Evidence 702 provides: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[42] the Supreme Court defined the district court's gatekeeping role, requiring a court to determine whether an expert's scientific testimony satisfies Rule 702's general requirements of reliability and relevance.[43] Originally intended to screen out "junk science," *Daubert* has been extended to apply to technical and other specialized knowledge.[44] Rule 702 now incorporates *Daubert*'s gatekeeping formulation by requiring district courts to ensure that "(1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Under Rule 702 and *Daubert*, the trial judge must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand."[45] "The focus ... must be solely on the principles and methodology, not on the conclusion that they generate."[46] To assess reliability, *Daubert* provides four non-exclusive criteria to apply to the expert's methodology: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) "general acceptance" within the relevant scientific community.[47] However, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject matter of his testimony."[48] "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[49]

**41.** *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

**42.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**43.** *See id.* at 597, 113 S.Ct. 2786.

**44.** *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Brooks v. Outboard Marine Corp.,* 234 F.3d 89, 91 (2d Cir.2000).

**45.** *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786.

**46.** *Id.* at 595, 113 S.Ct. 2786.

**47.** *See id.* at 593–94, 113 S.Ct. 2786.

**48.** *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167.

**49.** *Id.* at 153, 119 S.Ct. 1167; *see also Zaremba v. General Motors Corp.,* 360 F.3d 355, 358 (2d Cir.2004). In general, a trial court's decision to admit or exclude expert testimony is

Expert engineering testimony may rest on scientific foundations or on the personal knowledge or experience of the engineer.[50] In the latter case, a judge may inquire as to how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the scientific community.[51] In addition, trained experts commonly extrapolate from existing data.[52]

Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that are unfounded go to the weight, not the admissibility, of the testimony.[53]

The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive experience.[54] "Where an expert has the education or background to permit him to analyze a given set of circumstances, he can through reading, calcu-

lations, and reasoning from known scientific principles make himself very much an expert in the particular product even though he has not had actual experience in its manufacture."[55]

## B. Motion to Exclude Goldberg's Testimony

### 1. Goldberg's Proffered Expert Opinion

Goldberg opines that (1) Vermont's warnings were inadequate because a permanent warning should have been placed on the front of the glass to continually remind the consumer that the fireplace casing is a thermal hazard;[56] (2) rational people would touch the glass in the absence of such warning because they assume that the glass panel is there to protect them from the intense heat;[57] and (3) Colby's burns could have been prevented had Donnelly seen a warning on the actual glass.[58]

### 2. Goldberg's Qualifications

Based solely on a review of the record, Goldberg's educational background is

---

reviewed for abuse of discretion. *See Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir.1998) (reviewing *Daubert* decision of lower court to admit or exclude testimony under "highly deferential abuse of discretion standard"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995) (stating that a decision to admit is not an abuse of discretion unless "manifestly erroneous").

**50.** *See Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 180 (E.D.N.Y.2001) (citing *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167).

**51.** *See id.*

**52.** *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

**53.** *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996).

**54.** *See Pinckney v. Zep Mfg., Co.*, No. 94 Civ. 0742 (RSP/GJD), 1997 WL 204903, at *2 (N.D.N.Y. Apr.15, 1997); *Lappe v. American Honda Motor Co.*, 857 F.Supp. 222, 226 (N.D.N.Y.1994) ("In a product liability action, an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization affects the weight of the opinion, not its admissibility."), *aff'd*, 101 F.3d 682, 1996 WL 170209 (2d Cir.1996).

**55.** *Lappe*, 857 F.Supp. at 226–27.

**56.** *See* Report of Robert I. Goldberg, Ph.D. ("Goldberg Rep."), Ex. H to Lichtenstein Decl., at 4; Supplemental Report of Robert I. Goldberg, Ph.D. ("Goldberg Supp. Rep."), Ex. H to Lichtenstein Decl., at 2.

**57.** *See* Goldberg Rep. at 4.

**58.** *See* Goldberg Supp. Rep. at 3–4.

somewhat mysterious. Goldberg has a bachelor's and master's degree in art from an unnamed university.[59] He received his Ph.D. from Philathea College in an unnamed field.[60] Although he has taken some classes in engineering, he does not have an engineering degree.[61] Goldberg studied industrial design at Pratt Institute ("Pratt") for "several years in the evening," [62] and he "took additional courses . . . in management at New York University ("NYU"), finishing the equivalency of [his] MBA." [63] At the time he was in school, degrees in industrial design were not offered.[64]

Goldberg worked as a mechanical engineer for three or four years after he graduated from college.[65] In 1949, he founded the Associated Industrial Designers, Inc., which offered consulting services in industrial design, and later the Center for Packaging Education, which disseminates information regarding labeling and packaging.[66] As part of his work, he has written warnings for kitchen appliances and car signals.[67] Goldberg has also conducted human factors research regarding readability and color lettering for purposes of designing warnings.[68] Over the years, he has taught packaging courses at Pratt, NYU, the New School for Social Research, St. Francis College, and the Center for Packaging Education.[69] He always covered the area of warnings as a part of his curriculum.[70]

Finally, Goldberg has published "over 185 articles on packaging and merchandising subjects" and is the "author of a newsletter on packaging equipment, material and machinery." [71] He has also authored a section on design in the Packaging Encyclopedia and sections on packaging and trademarks in the Marketing Handbook.[72]

■ Goldberg testified that he has designed, taught about, and conducted research on warnings. Although Goldberg's educational background is somewhat murky, an expert may be qualified by experience.[73] Given Goldberg's experience in the fields of packaging and industrial design, he is qualified to render an expert opinion on the adequacy of warnings for the fireplace heater.

59. *See* Curriculum Vitae of Dr. Robert I. Goldberg ("Goldberg C.V."), Ex. H to Lichtenstein Decl. (stating that he has B.A., M.A., and Ph.D. degrees, but failing to indicate from where); Deposition of Robert Goldberg, Ph.D. ("Goldberg Dep."), Ex. I to Lichtenstein Decl., at 10 (testifying that he has B.A. and M.A. in art).

60. *See* Goldberg C.V.; Goldberg Dep. at 10 (testifying that he received his Ph.D. from Philathea, but failing to name the field).

61. *See* Goldberg Dep. at 10–11.

62. *Id.* at 11.

63. *Id.* at 10.

64. *See id.* at 12.

65. *See id.*

66. *See id.;* Goldberg C.V.

67. *See* Goldberg Dep. at 29, 43.

68. *See id.* at 31–32.

69. *See id.* at 15–18; Goldberg C.V.

70. *See* Goldberg Dep. at 16–17.

71. Goldberg C.V.

72. *See id.*

73. *See McCullock,* 61 F.3d at 1043 (holding that "quibble" over expert's lack of academic qualifications, where expert had "extensive practical experience," went to weight, not admissibility, of expert testimony); *Lappe,* 857 F.Supp. at 226 ("Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.").

### 3. Reliability of Goldberg's Opinion

#### a. Opinion Regarding Need for Warning on Glass Panel

Goldberg's report is based on his review of the fireplace heater's instruction manual; disclosures by Fairview and Vermont; the depositions of Donnelly, Santoro, and a Vermont engineer; standards for vented fireplace heaters; and "The Fireside Advisor," which contains information about fireplaces and hearth accessories.[74] He also relies on regulations for the Hazardous Substances Act, which states that if "any toy or other article intended for use by children ... presents ... a thermal hazard," it shall be considered hazardous.[75] In addition, Goldberg inspected the fireplace heater in Donnelly's home, although he did not operate it.[76] Goldberg based his supplemental report on an unnamed article by New York Times columnist Jay Romano and remarks by Alex Wilson, publisher of the Environmental Building News.[77] It was later revealed at Goldberg's deposition that he reviewed Bullerdiek's report even though he did not cite it in his own report.[78]

Goldberg's proffered testimony regarding the insufficiency of Vermont's warnings in its instruction manual and on the tethered plate is unreliable because it lacks a sufficient factual basis. The substance of Goldberg's opinion is that a permanent warning must be placed in the center of the glass panel and that anything less was insufficient.[79] Goldberg fails to explain, however, why placement of a warning in an adjacent location would be ineffective. Goldberg testified that he does not do research and relies solely on his experience in evaluating cases like this one.[80] Although experts may rely on existing data, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."[81] They must still explain how and why they could have extrapolated their opinions from the data.[82] Goldberg did not cite to any specific research for his opinion on the proper location of the warning, but rather relied only on his general experience in the field of communications.[83]

Furthermore, Goldberg did not thoroughly inspect nor did he independently

74. See Goldberg Rep. at 1.

75. Id. at 3 (quoting 16 C.F.R. § 1500.3).

76. See id.

77. See Goldberg Supp. Rep. at 1.

78. See Goldberg Dep. at 103.

79. See Goldberg Supp. Rep. at 2–3.

80. See Goldberg Dep. at 190.

81. Joiner, 522 U.S. at 146, 118 S.Ct. 512.

82. See id. at 144, 118 S.Ct. 512; Donnelly v. Ford Motor Co., 80 F.Supp.2d 45, 50 (E.D.N.Y.1999) (detailed explication of the reasoning that led to conclusion is necessary if statistical data and analysis are unavailable).

83. See Goldberg Dep. at 191–93; Brazier v. Hasbro, Inc., No. 99 Civ. 11258(MBM), 2004 WL 515536, at *7 (S.D.N.Y. Mar.16, 2004) (expert's opinion regarding child's motivation to put a toy ball in his mouth was inadmissible because expert was not qualified in the area of child psychology and because opinion was "based on conjecture and speculation rather than facts"); Cacciola, 127 F.Supp.2d at 183 (expert opinion rejected because "[t]he opinion which he would express rests upon unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation"); Donnelly, 80 F.Supp.2d at 49–50 (expert's opinion unreliable because nothing in the report explained his reasoning or methodology by which he reached his conclusions, and he did not identify any specific technique or method that he used, or cite any industry standards, surveys, or studies relied upon); Grdinich v. Bradlees, 187 F.R.D. 77, 82 (S.D.N.Y.1999) (expert testimony inadmissible because expert based his opinion solely on his own authority).

evaluate the fireplace heater.[84] Goldberg testified that he inspected the fireplace heater "very carefully and took pictures of it," yet he did not observe a tethered plate inside the control compartment [85]—the existence of which is not in dispute. He did not turn it on or take his own heat measurements, instead relying on information from Bullerdiek's expert report.[86] Goldberg also testified that if he were preparing a warning for a fireplace, he would contact the engineers to "find out what got hot, what got extremely hot, what the differences were, what the consumer touched and what was the operating procedure." [87] However, he took none of these steps, choosing to rely exclusively on the materials given to him by Donnelly.[88] Goldberg's expert opinion testimony is inadmissible given the total lack of scientific rigor with which he reached his conclusions.[89]

### b. Opinion Regarding Rationality of Touching Glass in the Absence of Warning

▇ Goldberg's opinion that a rational person would touch the glass surface of the fireplace heater is similarly unreliable. At his deposition, Goldberg was questioned about whether he had ever tested his hypothesis that a rational person would think

that the glass panel acts as a protective shield and that it does not get dangerously hot. He replied, "Yes, I have a glass over my fireplace." [90] Although Goldberg claimed to be basing his determination on "years of seeing these things and not just one instance," he later admitted that he had never seen anyone touch a vented fireplace and get burned as a result.[91] However, what is more troubling is his reliance on Mr. Romano's newspaper article for the proposition that "retail vendors of fireplace equipment recommend glass doors to homeowners and generally individuals living in a home with a fireplace are familiar with these glass shields," which do not get too hot.[92] Goldberg was not aware of Romano's background, nor the basis for the columnist's conclusions.[93] When challenged on why he did not conduct an independent study to test the accuracy of this conclusion, Goldberg testified that he did not need to because everyone he knew at his golf club in Somers, New York, had these glass screens, and he had touched ten or twelve of them "just to gather preliminary information, so [he] would have an idea what this was all about. It's never done systematically...." [94] Thus, Goldberg failed to test his hypothesis in any scientifically valid way, and his mode of analysis was completely subjective.[95] Under these circumstances, he is

**84.** See Brooks, 234 F.3d at 91–92 (rejecting expert testimony because expert had not performed any tests on the actual boat or engine involved in the accident, conducted any interviews with any of the witnesses, or conducted any actual testing to determine whether the use of the kill switch would have disengaged the engine under the circumstances).

**85.** Goldberg Dep. at 152–53.

**86.** See id. at 103, 127, 142.

**87.** Id. at 206.

**88.** See id.

**89.** Because I find that Goldberg's opinion lacks factual support, I do not address Ver-

mont's argument that Goldberg's reliance on the Hazardous Substances Act renders his testimony unreliable.

**90.** Id. at 137.

**91.** Id. at 138–39.

**92.** Goldberg Supp. Rep. at 2.

**93.** See Goldberg Dep. at 164–66.

**94.** Id. at 168.

**95.** See Kumho Tire, 526 U.S. at 154, 119 S.Ct. 1167 (district court's concerns about the expert's reliability may have been augmented by

precluded from offering expert testimony concerning the obviousness of the fireplace heater's alleged thermal hazard.

### c. Opinion Regarding Proximate Cause

Because Goldberg's opinion concerning the need for exterior warnings is inadmissible, it follows that he is also precluded from testifying that Colby's accident could have been prevented with better warnings. Thus, Goldberg's testimony is excluded in its entirety.

### C. Motion to Preclude Bullerdiek's Testimony

### 1. Bullerdiek's Proffered Expert Opinion

The heart of Bullerdiek's expert opinion is that the fireplace heater is defective because it did not come with either guards or adequate warnings. He opines that (1) the fireplace heater presented an unreasonable risk of contact burns; (2) the glass panel represented a hidden hazard, especially to children; (3) the product lacked safety guards; (4) the fireplace heater did not contain adequate warnings to prevent contact burns; and (5) the defective nature of the fireplace heater was a direct cause of Colby's injuries.[96]

Vermont argues that Bullerdiek is not qualified to render an expert opinion in this case because he has never taken a course in warnings, even though he has a degree in chemical engineering; although he was a contractor of the Consumer Products Safety Commission in the mid–1970's, he did not offer any opinions regarding warnings or the use of guards; he never worked for a manufacturer of gas heaters or fireplaces; he has no experience assessing human factors; and he primarily investigates and testifies in cases involving explosions and fires relating to defective propane connectors or propane overfills.[97] Bullerdiek's opinion is alleged to be unreliable because he failed to test his ideas regarding feasible alternative designs; he fails to provide a foundation for his opinion that the glass panel enticed viewers to touch the surface; he relies on anecdotal reports from the Internet; and upon learning that Vermont sells fireplace guards as an accessory, he asserted for the first time that Vermont should have offered a warning to consumers about the guard's importance in preventing accidents.[98]

### 2. Bullerdiek's Qualifications

Bullerdiek holds a bachelor of science degree in chemical engineering from Kansas State University. Although he also studied at the graduate level at Kansas State, he did not complete a graduate degree.[99]

Bullerdiek has extensive work experience as an engineer and consumer protection consultant. From 1959 to the present, he has held engineering positions at Northern Illinois Gas Co., Mason & Hanger–Silas Mason Co., Inc., Cornell Aeronautical Laboratory, Inc., Calspan Corp. ("Calspan"), Frontier Technical Associates, Inc., and Bullerdiek Associates, Inc.[100] He

his "repeated reliance on the 'subjective[ness]' of his mode of analysis in response to questions seeking specific information").

**96.** *See* Initial Report of W. Alan Bullerdiek ("Bullerdiek Rep."), Ex. L to Lichtenstein Decl., at 13–14.

**97.** *See* Vermont's Memorandum of Law in Support of Motion to Preclude Expert Testimony of Mr. W. Allan [sic] Bullerdiek ("Bullerdiek Daubert Mem.") at 5–7.

**98.** *See id.* at 7–15.

**99.** *See* Curriculum Vitae of Alan Bullerdiek ("Bullerdiek C.V.") attached to Bullerdiek Rep., Ex. L to Lichtenstein Decl., at 1.

**100.** Bullerdiek has held the positions of field engineer, project engineer, senior project engineer, head of development engineering section and high explosive laboratory, principal engineer, and head of applications research

has also served as a consultant to federal and state agencies with respect to consumer product safety matters since the 1960's. As a consultant to the U.S. Consumer Product Safety Commission ("CPSC"), Bullerdiek has examined the hazards of liquefied petroleum gas fuel in residential use, analyzed accident patterns, and evaluated safety standards for flame-fired furnaces, hot water heaters, clothes dryers, and ranges.[101] He led a similar effort involving flame-fired space heaters, and directed an analytical and experimental investigation of energy saving accessories for gas-fired appliances.[102] Bullerdiek was also retained by the State of California Energy Commission to assess the safety aspects of gas appliances, ignition systems, and accessories and how they might be affected by possible rule making.[103]

Bullerdiek has published extensively on the safety of various gas-fueled consumer products, and he has taught senior level courses in Consumer Product Standards at Buffalo State College. Furthermore, Bullerdiek is a member of numerous engineering and standard-setting professional societies, including the American National Standards Institute ("ANSI"). Over the past five years, Bullerdiek has been deposed in fifty-two cases and testified at trial in twelve cases.[104]

■ Given his background in engineering and vast experience in the field of gas-fired consumer products, Bullerdiek is qualified to testify as an expert on the safety of fireplace heaters. Although he has never worked for a manufacturer of fireplaces or gas heaters, he has studied space heaters, kitchen ranges, furnaces, and water heaters—all of which are sufficiently analogous to the fireplace heater in this case. Therefore, he can make himself an expert on fireplace heaters "through reading, calculations, and reasoning from known scientific principles." [105]

### 3. Reliability of Bullerdiek's Opinion

In writing his reports, Bullerdiek reviewed materials received from plaintiffs, as well as from independent sources. Bullerdiek examined the Amended Complaint, three instruction manuals for the fireplace heater, an input rating report performed on a random 43BDVT fireplace heater

---

section systems evaluation department. *See id.*

**101.** *See id.* at 5; Bullerdiek and Adams, Calspan Report No. YG–5569–D–4, Investigation of Safety Standards for Flame–Fired Space Heaters ("Calspan Rep. 4"), Ex. K to Lichtenstein Decl.; Bullerdiek and Adams, Calspan Report No. YG–5569–D–2, Identification and Classification of Potential Hazards Associated with the Use of Residential Flame–Fired Furnaces, Hot Water Heaters, Clothes Dryers and Ranges ("Calspan Rep. 2"), Ex. D(2) to Plaintiffs' Declaration in Opposition to Defendants' Daubert Motion to Exclude ("Pl. Daubert Opp."); Bullerdiek and Adams, Calspan Report No. YG–5569–D–3, Investigation of Safety Standards for Flame–Fired Furnaces, Hot Water Heaters, Clothes Dryers and Ranges ("Calspan Rep. 3"), Ex. D(3) to Pl. Daubert Opp.

**102.** *See* Bullerdiek C.V. at 5.

**103.** *See id.*

**104.** *See id.* at 2,6,7–11 (listing fifty-two selected publications); List of Cases attached to Bullerdiek Rep., Ex. L to Lichtenstein Decl. A review of the case law reveals that Bullerdiek's testimony was credited in *Sears, Roebuck and Co. v. Menegay*, 907 S.W.2d 72 (Tx. App.—Fort Worth 1995) (opinion that grill was defective because warnings in manual ineffective and should have been placed on the grill itself), and *Menschik v. Mid–America Pipeline Co.*, 812 S.W.2d 861 (Mo.Ct.App. 1991) (opinion that ethyl mercaptan was defective and unreasonably dangerous in the absence of additional warnings). His testimony was not admitted in *Martinez v. Yoho's Fast Food Equip.*, No. 02AP–79, 2002 WL 31752047 (Ohio App.2002), because he failed to show that the liquefied petroleum hose was the proximate cause of the accident.

**105.** *Lappe,* 857 F.Supp. at 226–27.

model, photographs of the fireplace heater, a Canadian Standards Association certificate of compliance and corresponding test report, and a bundle of pages entitled "43BDV Unique Drawings." He also reviewed Calspan Reports, ANSI standards, including the standard for vented gas fireplace heaters, the National Fuel Gas Code Handbook, New York State Uniform Fire & Building Code, and certification directories of various standard-setting associations, among other things. Bullerdiek also inspected Donnelly's fireplace heater.[106]

### a. Opinion Regarding Safety Risk of Fireplace Heater

Bullerdiek opines that the fireplace heater presents an unreasonable risk of contact burns, even though it meets ANSI standards.[107] Unlike Goldberg, Bullerdiek explains how he reached his conclusions and cites specific research and data in support of his conclusions. Bullerdiek based his opinion on work he performed for the CPSC on other gas-fired products.

He explained that while there have been "lots of studies with respect to burn injuries by many engineers over the years, . . . there's none that [he] know[s] of that are specific to fireplace glass." [108]

In his Calspan studies concerning space heaters and kitchen ranges, Bullerdiek derived a temperature-time response curve, which depicts the contact time it would take for a person to develop second or third degree burns at specific surface temperatures.[109] Bullerdiek concluded that the ANSI standard was meaningless as a burn hazard safeguard because one can receive second or third degree burns at contact times below human response time.[110] He recommended an optimal interface temperature of 131 degrees Fahrenheit to preclude contact burns, and he cites the water heater standard as an example of industry acceptance of his proposed temperature limit.[111]

■ Although Bullerdiek's opinion regarding the risk specific to fireplace heat-

---

106. *See* Bullerdiek Rep. at 2–3.

107. *See* Affidavit of W. Alan Bullerdiek ("Bullerdiek Aff."), Ex. A to Pl. Daubert Opp., at 20 ("Gas-fired appliances and controls certified to the ANSI standards are regularly subject to recall or field correction for safety reasons. . . . I have been involved on behalf of the government with similar programs involving products, all of which were certified to ANSI standards. The existence of a standard and compliance with that standard in, and of itself does not assure a safe product.").

108. Continuing Deposition of Alan Bullerdiek ("Bullerdiek Cont. Dep."), Ex. J to Lichtenstein Decl., at 35. *See Groobert v. President and Dirs. of Georgetown College*, 219 F.Supp.2d 1, 7 (D.D.C.2002) (personal experience was proper method for assessing reliability of expert testimony where there was an absence of reports or studies on the income of stock photographers).

109. *See* Bullerdiek Cont. Dep. at 36 ("That curve was done by me back in the 70's based

upon sound scientific information and has been confirmed by many others over time. Their numbers may vary by five or ten degrees, but they're basically identical. It's well-established by now pretty broadly across the industry.").

110. *See* Bullerdiek Rep. at 7; Calspan Rep. 4 at 11 (concluding that "[e]xisting surface temperature specifications are limited. There appears to be a disquieting tendency in published proposals for compromise thresholds of acceptability which are needlessly high, or to have exemptions effectively disemboweling the basic provisions.").

111. *See* Bullerdiek Cont. Dep. at 35–36; Calspan Rep. 4 at 34 ("There are good reasons why the non-reversible burn curve . . . should be the goal for safety standards. Higher temperatures result in destruction of the complete epidermis and blistering and subsequent loss of the epidermis occur. Depending on the surface area burned and the age and health of the victim, burns beyond this severity could even result in death. . . .").

ers does not satisfy all of the *Daubert* factors, this is not fatal. The Supreme Court has said that the *Daubert* factors may or may not be applicable depending on the circumstances.[112] Bullerdiek's testimony is reliable here because he bases his opinion on sufficient facts and data; his opinion is the product of reliable principles; and he has applied the principles reliably to the facts at hand.[113] It was reasonable for Bullerdiek to make inferences from his previous research given the absence of data on fireplace heaters and the similarity of the products (space heaters, kitchen ranges, water heaters, clothes dryers, and furnaces) as heat-producing devices with hot surfaces. Moreover, the underlying Calspan studies do satisfy the *Daubert* factors because Bullerdiek tested his hypothesis regarding contact burns; the studies were published; his ideas have gained acceptance within the scientific community; and he explains why industry standards are insufficient. Bullerdiek's

testimony regarding the contact burn hazard of fireplace heaters is therefore reliable.[114]

### b. Opinion Regarding Hidden Hazard

Bullerdiek's opinion concerning the fireplace heater's risk to children is also reliable because it is based on his previous studies of the injury patterns of children and his reliance on accepted data.[115] With respect to the appliances studied in the Calspan Reports, the age groups suffering burns were heavily weighted to age two and under.[116] Bullerdiek notes:

> Our earlier studies for CPSC noted that children were regularly being burned by contact with the glass front on stoves with a working oven, but seldom by contacting direct flames of a working range top or an open front space heater. This was a clear red flag that a small child would not recognize a glass front

**112.** *See Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167; *see also* Fed.R.Evid. 702 Advisory Committee Note (additional criteria that may be relevant to reliability include whether the expert is proposing to testify about matters growing naturally and directly out of research independent of litigation, and whether the expert has engaged in improper extrapolation).

**113.** *See* Fed.R.Evid. 702.

**114.** *See Daubert,* 509 U.S. at 592, 113 S.Ct. 2786 ("Presumably, this relaxation of the usual requirement of firsthand knowledge [contained in Fed.R.Evid. 702 and 703] ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."); *Freitas v. Michelin Tire Corp.,* No. 3:94Cv1812 (DJS), 2000 WL 424187, at *2 (D.Conn. Mar. 2, 2000) (opinion on design defect reliable because expert based his opinions on his own mathematical calculations and experience conducting burst tests on mismatched tires, as well as his review of burst tests performed by others, sworn testimony and reports of other experts, and industry and tire company documents); *Manual for Complex Litigation*

*(Fourth)* § 23.273 (2004) ("[A]ll methodologically sound studies should be considered, with the focus on whether the studies reasonably permit the inference or conclusion sought to be drawn.").

**115.** *See* Bullerdiek Dep. at 127 (stating that he relied on research he conducted for the CPSC); National Electronic Injury Surveillance System ("NEISS"), Preliminary NEISS Estimates of National Injuries, Ex. C(3) to Pl. Daubert Opp. (collecting statistics of injuries treated at participating emergency rooms); CPSC, NEISS On-line: Explanation of NEISS Estimates Obtained Through the CPSC Website, Ex. C(3) to Pl. Daubert Opp.; CPSC, Consumer Product Safety Review—Burn Center Reporting (regarding clothing-related thermal burns in children), Ex. C(3) to Pl. Daubert Opp.; CPSC, Safer Gas Water Heaters, Ex. C(3) to Pl. Opp.; Consumer Safety Unit, The Handbook of Child Measurements and Capabilities: Data for Design Safety, Ex. C(3) to Pl. Daubert Opp.

**116.** *See* Bullerdiek Cont. Dep. at 119.

on a heating device as a threat. Similarly, adults were perplexed that their children did not immediately react to the heat. This apparent anomaly caused a separate investigation to be performed.[117]

The follow-up investigation found that children ended up with longer contact times with hot surfaces, and therefore more serious injuries, because they had not yet learned to pull back from hot surfaces as a reflexive response.[118] Furthermore, caregivers "often underestimated the threat to children of hot surfaces."[119] In this case, Bullerdiek reasoned that contact burns from a fireplace heater are a serious threat to children "because of its analogy to other types of heating units and space heaters out there,"[120] and "to the glass-front oven."[121] For the same reasons noted above, Bullerdiek may extrapolate from his earlier research regarding children's risk of contact burns.

### c. Opinion Regarding Defectiveness of Fireplace Heater Due to Lack of Guards

■ Bullerdiek's opinion as to the defectiveness of the fireplace heater due to lack of guards, however, is not sufficiently reliable because his methodology is not sufficiently trustworthy. Bullerdiek makes the conclusory statement that he once did a study, which provided price information on guarding, and that there have been no technological breakthroughs since then as to the use of guard screens.[122] He added that economic studies "were either conducted, or were tested in the crucible of the marketplace, but not directly by [him]."[123] While Bullerdiek supplemented his initial report with a cost-benefit analysis conducted by Richard Hershey, all Hershey did was compute the cost of adding a panel screen or warning label to the fireplace heater.[124] Although the cost-benefit report prominently declares that Hershey has an M.B.A. degree, his attached resume makes no mention of his educational background and lists only two years of work experience as a consultant. Because of these questions regarding Hershey's credentials and experience, I cannot conclude that it was reasonable for Bullerdiek to rely on Hershey's analysis. Based on the record before me, I find that Bullerdiek's testimony on the issue of guards is not based upon sufficient facts and data and is not the product of reliable principles. Therefore, Bullerdiek is precluded from testifying that the fireplace heater was defective because it lacked a guard.[125]

---

117. Bullerdiek Aff. at 19–20.

118. *See* Bullerdiek Cont. Dep. at 127–29 ("We did a specific study when we were looking at it in the 1975 study because we were noting that children were not pulling away and people seeing the child being burned and noticing that they didn't pull away ... thought they were, quote, sticking to the appliance. In fact, it turns out that for that young a child it is a learned response, not an automatic reflex, and so they don't pull back automatically at very young ages. They'll yell, they'll react, but it will be a pain reaction, not a reflex reaction to pull back."); Bullerdiek Aff. at 4 ("The findings, in short, were that there was no innate fear of heat and no reflexive withdrawal response from heat with small children; it was a learning experience.").

119. Bullerdiek Aff. at 4–5.

120. *See* Bullerdiek Cont. Dep. at 202.

121. Bullerdiek Aff. at 5.

122. *See id.* at 3.

123. *Id.*

124. *See* Richard A. Hershey, Cost Benefit Analysis of safety warnings and equipment for ceramic glass enclosed gas fired fireplace insert and heaters, attached to Bullerdiek Supplemental Report ("Bullerdiek Supp. Rep."), Ex. B. to Pl. Daubert Opp.

125. Bullerdiek may still testify about the lack of guards on Donnelly's fireplace heater and that engineers follow a hierarchy in designing out hazards, because such testimony is not opinion evidence. He is only precluded from

### d. Opinion Regarding Defectiveness of Fireplace Heater Due to Inadequate Warning

■ Finally, Bullerdiek opined that warnings needed to be placed on the exterior of the fireplace heater to remind users of the thermal danger because users forget about hazards unless they have a cue reminder.[126] Bullerdiek based this opinion on his experience in consumer safety and on several articles on warnings and labeling.[127] For example, he relied on an article entitled *Warnings: A Human Factors Perspective*, in which the investigator concluded that "[a] safety critical message . . . should be physically present at the point of danger to be most effectively perceived. . . . Warnings buried in manuals . . . have low effectiveness compared to labels and warnings placed on the operating controls and displays of a tool or vehicle."[128] Bullerdiek also explained:

I've investigated many hundreds of accidents from looking at the in-depth investigations done by the National Fire Protection Association and by the Consumer Product Safety Commission and there are repetitive times where people will, for example, if you asked them do they know a gas water heater has a pilot light, for example, the answer is yes but they forget it when [they] were doing something else like working with flammable liquids or something. That is why it's not just enough to be able to know it . . . [you need] to have that cue reminder that once in a while, yes, . . . this is a danger and I better think about it. . . . [129]

Thus, Bullerdiek's opinions are not the *ipse dixit* of his own authority.[130] Accordingly, his opinion concerning the defectiveness of the product due to the absence of exterior warnings is sufficiently reliable to be admitted into evidence.

---

offering an expert opinion regarding the defectiveness of design due to the absence of guards.

126. *See* Bullerdiek Dep. at 213; *see also* Bullerdiek Cont. Dep. at 115 ("One of the reasons that you want it on the product itself is so that it doesn't require [] thinking about it and going to try to find a manual that may or may not be available. That's why it's important to have warnings on the product itself if at all possible.").

127. *See* Robert J. Cunitz, Ph.D., *Warnings: A Human Factors Perspective* (July 1990) (*"Warnings"*), Ex. C(1) to Pl. Daubert Opp., at 3 ("When warnings have been previously encountered, when the danger is known in the sense that one could, if asked, recall the fact of the danger and appropriate safety precautions, a warning can serve to alert and remind the individual of the danger and of what to do or not do to avoid harm. Since, in general, we can only attend to one thing at a time . . . an attention getting warning is often necessary and is commonly used to bring a safety critical situation to mind and thus to permit an informed choice and behavior consistent with safety."); Karnes, et al., *Effects of*

*Benign Experiences on the Perception of Risk* (1986), Ex. C(1) to Pl. Daubert Opp. (experiment evaluating the extent to which experiences that have not resulted in injury or concern for injury may affect the perception of risk associated with warnings); Harry McIntyre, *Labeling Hazardous Products*, Ex. C(1) to Pl. Daubert Opp. (discussing safety aspects of precautionary labeling); ANSI Consumer Interest Council, *ANSI Guide for Developing User Product Information* (1990), Ex. C(1) to Pl. Daubert Opp. ("[W]arnings and safety information should, whenever possible, be repeated directly on the product itself, as well as in the product literature and other media.").

128. *Warnings*, *supra* note 127, at 5.

129. Bullerdiek Dep. at 213.

130. *See, e.g., McCullock*, 61 F.3d at 1043 (opinion reliable based on review of various materials and educational sources on safety and ventilation of HC binder, manufacturer's safety data sheet, interviews with the plaintiff, his own industrial experience with ventilation, and practical experience with fumes).

### e. Proximate Cause

Because four of his five opinions as to the defective nature of the product are admissible, Bullerdiek is permitted to testify that the unsafe condition of the fireplace heater was a direct cause of Colby's injuries.

### 4. Relevance of Bullerdiek's Opinion

■ Although Vermont does not challenge the relevance of Bullerdiek's testimony, the Court, as part of its gatekeeping function, must still determine—as I do here—that Bullerdiek's opinions regarding the contact burn hazard of fireplace heaters, its threat to children, and the need for exterior warnings are all relevant to this case. The former two opinions go to the issues of the dangerousness of the product and the negligence of the manufacturer and installer. His testimony about exterior warnings is relevant to the adequacy of Vermont's warnings in its instruction manual and on the tethered plate. Bullerdiek is therefore permitted to offer these expert opinions.

## III. SUMMARY JUDGMENT MOTION

### A. Legal Standard

When deciding a motion for summary judgment, a district court may consider only admissible evidence.[131] If a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702 of the Federal Rules of Evidence, the court must make the summary judgment determination on a record that does not include that evidence.[132]

Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[133] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'"[134] "A fact is material for these purposes if it 'might affect the outcome of the suit under the governing law.'"[135]

The movant has the burden of demonstrating that no genuine issue of material fact exists.[136] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts,"[137] and it must "come forward with 'specific facts showing that there is a genuine issue for trial.'"[138] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.[139]

**131.** *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir.2000); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997); *Borgognone v. Trump Plaza*, No. 98 Civ. 6139(ILG), 2000 WL 341135, at *2 (E.D.N.Y. Mar.9, 2000).

**132.** *See Raskin*, 125 F.3d at 66; *Donnelly*, 80 F.Supp.2d at 47.

**133.** Fed.R.Civ.P. 56(c).

**134.** *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**135.** *Id.* (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

**136.** *See Powell v. National Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.2004).

**137.** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**138.** *Powell*, 364 F.3d at 84 (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

**139.** *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir.2004).

## B. Governing Law

■ In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law.[140] In tort cases, New York applies an "interest analysis" rather than situs of the tort to determine which of the competing jurisdictions has the greater interest in having its law applied to the litigation.[141] No party seeks application of New Jersey law, and I find that New York law governs because New York has the greatest contacts with the parties and plaintiffs' claims seek to regulate defendants' conduct.

## C. Plaintiffs' Claims

### 1. Applicable Law

#### a. Negligence

■ To make out a prima facie case for negligence in New York, a plaintiff must show (1) that the manufacturer owed plaintiff a duty to exercise reasonable care; (2) breach of that duty so that a product is rendered defective, *i.e.*, reasonably certain to be dangerous; (3) that the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage.[142]

#### b. Strict Products Liability

■ "As the law of strict products liability has developed in New York, a plaintiff may assert that the product is defective because of a mistake in the manufacturing process or because of improper design or because the manufacturer failed to provide adequate warnings regarding the use of the product." [143] The plaintiff must show that a defective product caused plaintiff's injury.[144]

#### (1) Manufacturing Defect

Because there is no manufacturing defect claimed, I will not discuss the applicable law in New York. While claims for manufacturing defect are asserted in the complaints, they appear to be boilerplate language as plaintiffs do not argue that there was a flaw in the manufacturing process of the fireplace heater. Therefore, Vermont is entitled to summary judgment on these claims.

#### (2) Defective Design

■ To prevail on a claim for design defect under New York law, a plaintiff must demonstrate that (1) the product as designed was "not reasonably safe"; (2) there was a safer, feasible alternative design at the time of manufacture; and (3) the defective design was a substantial factor in causing the plaintiff's injuries.[145] The first two elements, grouped together, are often referred to as the risk-utility balancing test used to determine whether a product is "not reasonably safe." [146] In

140. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Krauss v. Manhattan Life Ins. Co. of N.Y.*, 643 F.2d 98, 100 (2d Cir.1981).

141. *See Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994); *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); *Calla v. Shulsky*, 148 A.D.2d 60, 63, 543 N.Y.S.2d 666 (1st Dep't 1989).

142. *See McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir.1997); *Cacciola*, 127 F.Supp.2d at 185.

143. *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106–07, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983) (citations omitted).

144. *See McCarthy*, 119 F.3d at 154.

145. *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204. *Accord Colon v. BIC USA, Inc.*, 199 F.Supp.2d 53, 83 (S.D.N.Y.2001).

146. *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 ("[T]he proper standard to be applied should be whether the product as designed was 'not reasonably safe'—that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude

balancing the risks, a jury may consider the following: (1) the utility of the product to the public as a whole and the individual user; (2) the likelihood that the product will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to avoid injury from the product; (6) the degree of awareness of the potential danger of the product; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.[147] The risk-utility analysis "is rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits." [148]

Because "there is almost no difference between a prima facie case in negligence and one in strict liability" for design defect,[149] I will analyze plaintiffs' negligence and design defect claims under the single test mentioned above.

## (3) Failure to Warn

A failure to warn claimant must demonstrate that (1) a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of the harm. "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." [150] "Once a warning is given, the focus shifts to the adequacy of the warning.... [New York] courts have required ... that warnings must clearly alert the user to avoid certain unsafe uses of the product which would appear to be normal and reasonable." [151]

There are several important considerations that directly affect the adequacy of a warning, including the location and conspicuousness of the warning and the method in which the warning is communicated to the ultimate user. Of critical importance is whether the warning sufficiently conveys the risk of danger associated with the product and is qualita-

that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner."); *accord Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 454 (S.D.N.Y.1999) (citing *Cover v. Cohen*, 61 N.Y.2d 261, 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984)) ("[a]vailable alternatives" must exist such that a reasonable person, balancing the product's risks, cost and utility against the alternative's risk, cost and utility, would conclude that it should not have been marketed).

147. *See Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204.

148. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

149. *Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 263 A.D.2d 335, 700

N.Y.S.2d 588, 591 (3d Dep't 2000); *Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 ("[I]n general, ... the strict liability concept of 'defective design' [is] functionally synonymous with the earlier negligence concept of unreasonable designing.") (citations omitted).

150. *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998).

151. *Cooley v. Carter–Wallace Inc.*, 102 A.D.2d 642, 646, 478 N.Y.S.2d 375 (4th Dep't 1984) (quotation marks and citation omitted); *accord Billiar v. Minnesota Mining and Mfg. Co.*, 623 F.2d 240, 245 (1980) ("The duty is not merely to warn, but to warn adequately."); *Ezagui v. Dow Chem. Corp.*, 598 F.2d 727, 733 (2d Cir.1979) ("Inadequate warnings will render a product defective for purposes of warranty and strict products liability.").

tively sufficient to impart the particular risk of harm.[152]

■ In New York, there is a presumption that a user would have heeded warnings if they had been provided, and that the injury would not have occurred.[153] However, the presumption may be rebutted by specific facts showing that the warning would have been futile.[154] Failure to warn claims are identical under strict liability and negligence theories of recovery.[155]

■ New York recognizes two exceptions to a failure to warn claim: (1) "where the injured party was fully aware of the hazard through general knowledge, observation or common sense," [156] *i.e.*, he was a knowledgeable user, and (2) where the risks are open and obvious.[157]

> When a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning. On the other hand, the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user.[158]

### c. Breach of Warranty

■ To prevail on a breach of implied warranty of merchantability, a plaintiff must show that the product at issue is not "fit for the ordinary purposes for which such goods are used" and it caused injury as a result.[159] In determining whether the product was unmerchantable, the focus is on "the expectations for the performance of the product when used in the customary, usual, and reasonably foreseeable manners." [160] "A warranty of fitness for ordinary purposes does not mean that the product will fulfill a buyer's every expectation," but rather ensures that the product is minimally safe for its expected purpose.[161]

Although there is a high degree of overlap between breach of warranty and strict products liability, there is a distinction between the "defect" analysis in both types of claims.

> The former class of actions originates in contract law, which directs its attention to the purchaser's disappointed expectations; the latter originates in tort law, which traditionally concerned itself with social policy and risk allocation by means other than those dictated by the marketplace.[162]

**152.** *Cooley*, 102 A.D.2d at 646, 478 N.Y.S.2d 375; *Johnson v. Johnson Chem. Co.*, 183 A.D.2d 64, 69, 588 N.Y.S.2d 607 (2d Dep't 1992) ("Liability may be premised upon the complete absence of warnings as to a particular hazard, or upon the inclusion of warnings which are insufficient.").

**153.** *See Anderson*, 76 F.Supp.2d at 441.

**154.** *See id.*

**155.** *See id.* at 439; *Denny*, 87 N.Y.2d at 258, 639 N.Y.S.2d 250, 662 N.E.2d 730.

**156.** *Liriano*, 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303; *accord Hutton v. Globe Hoist Co.*, 158 F.Supp.2d 371, 376 (S.D.N.Y. 2001).

**157.** *See Liriano*, 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303.

**158.** *Id.* at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303.

**159.** *Brazier*, 2004 WL 515536, at *4 (citing *Denny*, 87 N.Y.2d at 256, 639 N.Y.S.2d 250, 662 N.E.2d 730).

**160.** *Denny*, 87 N.Y.2d at 258–59, 639 N.Y.S.2d 250, 662 N.E.2d 730.

**161.** *Id.* at 259, 639 N.Y.S.2d 250, 662 N.E.2d 730.

**162.** *Id.* at 259 n. 4, 639 N.Y.S.2d 250, 662 N.E.2d 730. The New York Court of Appeals also notes that it cannot merge the two causes of action because a legislative source of authority exists for the breach of warranty claim. In other jurisdictions that have merged the two claims, the courts were relying on specific state statutory schemes gov-

Therefore, it is possible to be liable for breach of implied warranty even though strict products liability has not been established.[163]

## 2. Discussion

Vermont argues that it is entitled to summary judgment on Colby and Donnelly's claims for the following reasons. Colby and Donnelly cannot show that the fireplace heater was not reasonably safe because they lack statistical evidence that an unacceptable number of people are being harmed by the product. They cannot show the existence of a feasible alternative design because there is no evidence that people would buy a product "defaced" with warnings or a mesh wire screen. Donnelly was a knowledgeable user because he owns a construction company that installs fireplaces in the houses it builds. The danger of burns from the fireplace heater was open and obvious so that there was no duty to warn. Donnelly cannot establish proximate cause because no reasonable jury could conclude that he would have altered his behavior given that as of the day of his deposition, he had still not read any of the warnings in the manual or tethered plate. Finally, Vermont asserts that to the extent they assert a claim for negligent failure to provide a manual, there is no evidence that the manual was not contained with the product.[164]

### a. Strict Products Liability

#### (1) Design Defect

■■■ With respect to plaintiffs' design defect claim, there is sufficient evidence that a jury could reasonably conclude that the fireplace heater is not reasonably safe. There is evidence that the glass panel of the fireplace heater reaches temperatures of up to 432 degrees Fahrenheit in the center and 260 degrees Fahrenheit in the corners.[165] There is evidence that at high enough temperatures, people can sustain second or third degree burns within seconds of contact with a hot surface.[166] It is undisputed that the fireplace heater did not come equipped with guards to prevent accidental contact with the glass, nor did it contain exterior warnings regarding the contact burn hazard. Plaintiffs have submitted evidence that children under age two are particularly susceptible to contact burns because they have yet to develop the proper reflexive response to hot surfaces.[167] Don Jamieson, Vermont's Director of Engineering, also testified that Vermont did not design the fireplace heater to heat the glass, but that it was a byproduct of the combustion process; the fireplace heater is designed to heat the room through convection through the upper louver.[168] This evidence is sufficient to create a triable issue of fact as to the dangerousness of the fireplace heater.

Furthermore, there is a material issue of fact as to the feasibility of providing

erning products liability litigation and containing express preemptive language. *See id.* at 259, 639 N.Y.S.2d 250, 662 N.E.2d 730.

163. *See id.* at 251, 639 N.Y.S.2d 250, 662 N.E.2d 730.

164. *See* Vermont's Memorandum of Law in Support of Motion for Summary Judgment ("Vermont SJ Mem.") at 4, 7–9, 11–12; Vermont's Reply Memorandum of Law in Support of Motion for Summary Judgment ("Vermont's SJ Reply") at 4–5, 8–9.

165. *See* Input Rating Report Performed on Random Model 43BDVT Fireplace Heater on Feb. 26, 1998, Ex. C(3) to Pl. Daubert Opp.

166. *See* Bullerdiek Rep. at 7; Calspan Rep. 4, at 11.

167. *See* Bullerdiek Aff. at 20; Bullerdiek Cont. Dep. at 127–29.

168. *See* Jamieson Dep. at 76–77.

guards with fireplace heaters. Vermont sells a protective screen as an optional accessory at a cost of approximately fifty-two dollars.[169] Given that the fireplace heater costs over twelve hundred dollars,[170] a reasonable jury could find that it is practicable to provide the screen as standard equipment in light of the small incremental cost. Vermont's decision to sell optional screens at a relatively low cost raises a material issue of fact as to whether the screens could have been attached to the fireplace heaters or included as a separate device with the product.

Vermont protests that plaintiffs have failed to provide statistical evidence that an "unacceptable number of persons or children are being harmed by the product" and that they failed to show that fireplace heaters were causing more contact burn injuries than ordinary fireplaces.[171] This argument fails for several reasons. *First*, it presumes that there is a definitive, absolute number of people who may be harmed by a product before it is deemed defectively dangerous. It would be impossible and against public policy for a court to make such a determination. *Second*, although the number of injuries could affect the reasonableness of the product's risk to consumers, likelihood of injury is only one

factor that may be considered in a risk-utility analysis. A jury may also consider other factors, such as the ability of children to avoid injury from the fireplace heater and the degree of awareness of the potential danger of the product.[172] *Third*, the argument that there is no evidence that fireplace heaters cause more contact burns than ordinary fireplaces is completely irrelevant. Ordinary fireplaces are not enclosed in glass, nor do they contain surfaces demonstrated to cause contact burns.

### (2) Failure to Warn

With respect to the failure to warn claims, Vermont's principal argument is that it had no duty to warn because the danger was open and obvious and Donnelly was a knowledgeable user.

 Although Vermont posits that "there is no more open and obvious danger than the danger of being burned by . . . objects in close proximity to fire," the Court cannot conclude that the risk of contact burns is obvious as a matter of law. "Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question."[173] In this case, plaintiffs have offered evidence that Vermont sells decorative gas fireplaces that have clear glass panels similar to fire-

169. *See* Vermont Castings Hearth Enhancements, Ex. H to Plaintiffs' Declaration in Opposition to Defendant–Manufacturer's, The Vermont Castings Majestic Products Company, Summary Judgment Motion ("Pl. SJ Opp.") (cost of child guard screen listed as fifty two dollars); 43BDVT Product Manual, Ex. M. to Lichtenstein Decl., at 33 figs. 58, 60; Bullerdiek Dep. at 95, 102–09, 117–18; Price Information for Diamond Hole Mesh Safety Screen, attached as unnumbered exhibit to Bullerdiek Supp. Rep. (noting cost of screen as sixty dollars); Vermont Daubert Mem. at 9 (stating that Vermont sold "the same type of screen" as the manufacturer identified by Bullerdiek in his supplemental report).

170. *See* Fairview Invoice, Ex. E to Lichtenstein Decl.

171. *See* Vermont SJ Mem. at 4.

172. *See Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204 (enumerating factors considered in risk-utility test).

173. *Liriano*, 92 N.Y.2d at 242, 677 N.Y.S.2d 764, 700 N.E.2d 303; *accord Anderson*, 76 F.Supp.2d at 445 (dangers of using trampoline not obvious as a matter of law). *But see Hutton*, 158 F.Supp.2d at 376–77 (obvious that a large object on a post may fall and plaintiff was aware of the possibility); *Nassif v. National Presto Indus., Inc.*, 731 F.Supp. 1422, 1425 (S.D.Iowa 1990) (obvious that space heater could burn flesh if held too close to heater for extended amount of time).

place heaters, but do not get as hot.[174] There is also some evidence that some fireplace screens are made of glass.[175] A person having experience with decorative gas fireplaces or glass fireplace screens might not realize that the glass panels of fireplace heaters present a risk of contact burns.[176] A reasonable person might be unaware that "a number of factory built fireplaces have become available that function as . . . serious overnight heaters that can warm all or part of your house all winter long."[177] Furthermore, Bullerdiek testified that "contacting a solid surface is a very effective way of transmitting heat that will cause severe damage, and . . . in fact, open flames actually had a lower accident rate which might be counterintuitive. . . ."[178] His testimony, along with his supporting documentation from the CPSC, indicate that people underestimate the risk of burns from hot surfaces relative to the risk from open flames. Therefore, the obviousness of the fireplace heater's contact burn hazard is a fact issue appropriately decided by a jury.

 Vermont's knowledgeable user argument also fails because a jury could conclude that Donnelly was not aware of the risk even though he is the principal of a construction company. At the time of Colby's accident, Ashmar had only installed traditional wood burning fireplaces in its houses, and not gas fireplace heaters.[179] Donnelly had never owned, purchased, or installed a gas fireplace prior to his purchase of the fireplace heater.[180] He testified that he was unaware that the fireplace heater's primary function was to heat the house and that he does not use it in that capacity.[181] Furthermore, Donnelly stated that he did not know that the glass panel of the fireplace heater got extremely hot and that touching the glass would result in serious burns.[182] In cases where reasonable minds might disagree as to the extent of plaintiff's knowledge of the danger, the question is one for the jury.[183]

 Plaintiffs' failure to warn claims must go to the jury because there is a genuine issue of material fact as to whether the provided warnings were adequate to prevent Colby's injuries. Although Vermont's manual specifically warned users about the "high glass surface temperature" and to "stay away to avoid burns," plaintiffs have submitted evidence that warnings buried in manuals are not effective.[184] In addition, the fact that the tethered plate also contained warnings is not dispositive because the plate was located inside the fireplace heater's lower control compartment. The compartment did not need to be accessed in order to operate the fire-

---

174. *See* Ackert Dep. at 138, 163. *See also* Jamieson Dep. at 42–43 (acknowledging the existence of electric fireplaces that simulate flames electrically and noting that some produce heat while others do not).

175. *See, e.g.*, Vermont Instruction Manual, *supra* note 22, at 34 fig. 60 (bay window screen).

176. *See, e.g.*, Affidavit of Lauren Reiss–Pollard, Owner of a Majestic Brand Gas Fireplace, Ex. B to Pl. SJ Opp., ¶¶ 2–5.

177. The Fireside Advisor (1990–91), Ex. H to Pl. SJ Opp., at 4.

178. Bullerdiek Dep. at 128.

179. *See* Donnelly Dep. at 27, 35.

180. *See id.* at 102.

181. *See id.* at 32.

182. *See id.* at 49–50.

183. *See Liriano*, 92 N.Y.2d at 241, 677 N.Y.S.2d 764, 700 N.E.2d 303; *Billiar*, 623 F.2d at 245 (fact issue as to extent of employee's knowledge because she testified that although she knew the product was harmful to skin, she did not know how extremely harmful it could be).

184. *See supra* notes 126–29 and accompanying text.

place heater once the pilot light had been lit and the gas control has been put in its operative position; it could be operated with a flip of a switch.[185] Thus, one could operate the product without ever seeing the plate's cautionary language. "Where ... the supplier has provided some warning, plaintiff's knowledge of that warning could be dispositive only if the warning was clearly adequate."[186] These facts, combined with Bullerdiek's opinion regarding the need for exterior warnings, creates a sufficient issue of triable fact.[187]

 Vermont argues that plaintiffs cannot establish proximate cause because Donnelly would not have heeded an exterior warning given his admitted propensity not to read warnings. However, Vermont has not rebutted the presumption that a user would have heeded a warning if given, and that the accident would not have occurred. Donnelly testified that if he had known the fireplace heater got so hot he would not have allowed his daughter Ashley to turn it on.[188] He furthered stated that had there been an exterior warning not to operate the fireplace heater without adult supervision, he would not have left it in use without such supervision.[189] Since Colby's accident, the only time Donnelly uses the fireplace heater is if he is alone or if he has a guest and there are no children present.[190] In addition, Donnelly now uses a screen in front of his fireplace heater.[191] Hence, there is clearly a dispute over whether the accident could have been prevented with a more effective warning.[192]

185. *See* Jamieson Dep. at 146–50.

186. *Billiar*, 623 F.2d at 245.

187. *See McCullock*, 981 F.2d at 658 (adequacy of manufacturer's warnings was a question of fact); *Billiar*, 623 F.2d at 246 (question of adequacy of manufacturer's warning on the label of a container of caustic components, was correctly submitted to the jury); *Anderson*, 76 F.Supp.2d at 443 (finding that a jury could reasonably conclude that the placement of a warning in the middle of an owner's manual was insufficient to alert user to the danger); *Liriano*, 92 N.Y.2d at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303 ("Failure-to-warn liability is intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause."); *Johnson*, 183 A.D.2d at 69, 588 N.Y.S.2d 607 (sufficiency of warning is question of fact); *Darsan v. Guncalito Corp.*, 153 A.D.2d 868, 870, 545 N.Y.S.2d 594 (2d Dep't 1989) (plaintiff's complaint that machine was defective by virtue of failure to 'display with sufficient prominence' any warnings of the danger raises fact issue precluding summary judgment); *Cooley*, 102 A.D.2d at 642, 478 N.Y.S.2d 375 ("The adequacy of the warning in a products liability case based on a failure to warn is, in all but the most unusual circumstances, a question of fact to be determined at trial.").

188. *See* Donnelly Dep. at 50.

189. *See id*. at 54.

190. *See id*. at 51.

191. *See* Deposition of William R. Baynes, Vermont's proffered expert, Ex. E to Pl. SJ Opp., at 40. The Baynes deposition is cited only for lay testimony because the record before the Court is insufficient to evaluate the reliability, and thus admissibility, of Bayne's proffered expert opinion.

192. *See Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir.1999) (when defendant's negligent action is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that causal tendency is enough to establish a prima facie case of cause-in-fact); *Travelers Indem. Co. of Ill. v. Hunter Fan Co.*, No. 99 Civ. 4863 JFK, 2002 WL 109567, at *5 (S.D.N.Y. Jan.28, 2002) (issue of fact as to proximate cause because unknown whether plaintiff would have refrained from positioning his halogen lamp in a downbridge position if the manufacturer had issued a warning against such positioning); *Johnson*, 183 A.D.2d at 71, 588 N.Y.S.2d 607 ("A consumer ... who, by her own admission, tends to ignore one sort of label, might pay heed to a different, more promi-

Finally, Vermont contends that it is entitled to summary judgment because plaintiffs have offered no evidence that the manual was not contained with the fireplace heater. However, whether Donnelly received a manual is a disputed issue of material fact. Donnelly testified that he was never supplied with any manuals for the fireplace heater, while Fairview's president, Art Ackert, claimed that the manual is always included with Vermont products.[193] This raises a disputed issue of fact.

### b. Breach of Warranty

■ Summary judgment is denied with respect to plaintiffs' breach of warranty claims because the parties disagree as to the ordinary purpose of the fireplace heater. Vermont contends that the fireplace heater was fit for its intended use as a heater.[194] However, it is unclear from the record whether the fireplace heater was specifically marketed as a heater,[195] and in fact, there is evidence that the fireplace heater had a dual purpose for aesthetics

and heat.[196] Donnelly testified that he did not purchase the product to heat his home, but for its appearance and ease of use.[197] He did not expect that the fireplace heater could become so hot and that it could cause burns on contact.[198] In addition, even if the purpose of the fireplace heater was to warm the house, a rational fact finder could determine that it was not minimally safe for such ordinary purpose.[199] A jury should thus decide Donnelly's breach of warranty claims. In addition, although Colby was not a party to the sale contract, her breach of warranty claim survives because it was reasonable to expect that the buyer's daughter could be affected by the fireplace heater.[200]

### D. Santoro's Claims

### 1. Applicable Law

### a. Negligent Infliction of Emotional Distress

■ A cause of action for negligent infliction of emotional distress is premised upon a breach of duty which unreasonably endangers the plaintiff's physical safety or causes the plaintiff to fear for her safety.[201]

---

nent or more dramatic label. The reasonableness of her behavior is for the jury to decide.").

**193.** *See* Donnelly Dep. at 27; Ackert Dep. at 173–74.

**194.** *See* Vermont SJ Mem. at 14.

**195.** *See* Fireside Advisor, *supra* note 177, at 4 (noting the availability of factory built fireplaces that act as primary heat sources and advising that such fireplaces are identified by an affixed EPA hand tag); Jamieson Dep. at 114 (although the Fireside Advisor indicates that fireplace heaters have an EPA hand tag, his understanding was that the tag is only applicable to wood burning fireplaces); *id.* at 105 (stating that although some fireplaces are specifically rated as heaters, Vermont represents that they are all heaters).

**196.** *See* Jamieson Dep. at 70.

**197.** *See* Donnelly Dep. at 30, 32.

**198.** *See id.* at 49–50.

**199.** *See Denny*, 87 N.Y.2d at 263, 639 N.Y.S.2d 250, 662 N.E.2d 730 (rational fact finder could conclude that vehicle was not safe for ordinary purpose of daily driving for which it was marketed and sold).

**200.** *See* N.Y. U.C.C. § 2–318 ("A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."); *see also Singer v. Federated Dep't Stores, Inc.*, 112 Misc.2d 781, 447 N.Y.S.2d 582, 584 (N.Y.Sup.1981) (absence of contractual relationship between spouses and manufacturer did not preclude spouses from maintaining causes of action against manufacturer for breach of warranty).

**201.** *See Sheila C. v. Povich*, 781 N.Y.S.2d 342, 2004 WL 1900423 (1st Dep't Aug.26, 2004); *E.B. v. Liberation Publ'ns*, 7 A.D.3d 566, 777 N.Y.S.2d 133, 135 (2d Dep't 2004); *Savva v.*

Under this zone-of-danger rule, a plaintiff may recover for mental anguish only if the plaintiff herself was in danger of bodily injury from the defendant's negligence.[202]

It is premised on the traditional negligence concept that by unreasonably endangering the plaintiff's physical safety the defendant has breached a duty owed to him or her for which he or she should recover all damages sustained including those occasioned by witnessing the suffering of an immediate family member who is also injured by defendant's conduct.[203]

"[T]he compensable emotional distress must be tied, as a matter of proximate causation, to the observation of the serious injury or death of the family member and such injury or death must have been caused by the conduct of the defendant."[204] Exceptions to the zone-of-danger rule include instances in which the emotional harm is due to the negligent failure to deliver a corpse or the negligent delivery of a false message of death.[205] "Moreover, a cause of action for either intentional or negligent infliction of emotional distress must be supported by allegations of conduct by the defendants so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency...."[206]

### b. Recovery for Loss of Consortium, Loss of Services, and Medical Expenses

■ Consortium includes "such elements as love, companionship, affection, society, sexual relations, solace and more."[207] A loss of consortium claim must particularize a loss of one of these elements.[208] A parent may not recover damages for loss of consortium as a result of injuries to the child due to negligence.[209] "[T]he existence of the right of a husband or wife, in view of the nature of the marital relation, to bring an action derived from injuries to his or her spouse, to whatever extent it may be said to be analogous, does not warrant extending this right to a child."[210]

However, a parent may recover for loss of services of a child upon a proper showing of the value of lost services.[211] "The cause of action ... arises out of the inva-

---

*Longo*, 8 A.D.3d 551, 779 N.Y.S.2d 129, 131 (2d Dep't 2004); *Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (2d Dep't 1986).

**202.** *See Bovsun v. Sanperi*, 61 N.Y.2d 219, 228, 473 N.Y.S.2d 357, 461 N.E.2d 843 (1984); *DeAguiar v. County of Suffolk*, 289 A.D.2d 280, 734 N.Y.S.2d 212, 212 (2d Dep't 2001); *Wallace v. Parks Corp.*, 212 A.D.2d 132, 142, 629 N.Y.S.2d 570 (4th Dep't 1995).

**203.** *Bovsun*, 61 N.Y.2d at 229, 473 N.Y.S.2d 357, 461 N.E.2d 843.

**204.** *Id.* at 231–32, 473 N.Y.S.2d 357, 461 N.E.2d 843.

**205.** *See Green v. Leibowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 149 (2d Dep't 1986).

**206.** *Sheila C.*, at 357.

**207.** *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 502, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968).

**208.** *See Anderson v. Eli Lilly & Co.*, 158 A.D.2d 91, 94–95, 557 N.Y.S.2d 981 (3d Dep't 1990).

**209.** *See Gilbert v. Stanton Brewery*, 295 N.Y. 270, 67 N.E.2d 155 (1946) (reversible error to allow mother to recover for loss of child's companionship); *Devito v. Opatich*, 215 A.D.2d 714, 715, 627 N.Y.S.2d 441 (2d Dep't 1995) (loss of society of child is not compensable); *McCauley v. Carmel Lanes Inc.*, 178 A.D.2d 835, 837, 577 N.Y.S.2d 546 (3d Dep't 1991) (same); *Beyer v. Murray*, 33 A.D.2d 246, 248, 306 N.Y.S.2d 619 (4th Dep't 1970) (same); *Foti v. Quittel*, 19 A.D.2d 635, 635, 241 N.Y.S.2d 15 (2d Dep't 1963) (same).

**210.** *De Angelis v. Lutheran Med. Ctr.*, 58 N.Y.2d 1053, 1055, 462 N.Y.S.2d 626, 449 N.E.2d 406 (1983).

**211.** *See Devito*, 215 A.D.2d at 715, 627 N.Y.S.2d 441 (cannot recover for loss of services where there is no evidence of the value of loss); *Foti*, 19 A.D.2d at 635, 241 N.Y.S.2d

sion of the right of the parent to the services of his minor child, and is construed as a personal injury action under Section 37–a of the General Construction Law," [212] which defines "personal injury."

■ In addition, although a parent may recover for medical expenses actually incurred in treating the injured child, she may not recover for future medical expenses; only the child possesses that right of recovery.[213] The parent's derivative action is grounded upon the parental obligation of support, which includes reasonable medical care.[214]

### 2. Discussion

#### a. Negligent Infliction of Emotional Distress

■ Under New York law, it is well-settled that a person can only recover for emotional distress from the serious injury of a family member where that person was herself in the zone of danger. Because Santoro was not present at the time of Colby's accident, Vermont is entitled to judgment as a matter of law on this claim.

#### b. Recovery for Loss of Consortium, Loss of Services, and Medical Expenses

Santoro's only viable claim is for recovery of sums she paid for Colby's medical treatment. She cannot recover damages for the loss of her daughter's companionship. Though the law allows her to recoup the value of her daughter's lost services, Santoro has not made a proper showing of such loss. Therefore, Vermont is granted summary judgment on all of Santoro's claims, with the exception of her claim for medical expenses.

### V. CONCLUSION

Vermont's motion to preclude the expert testimony of Dr. Robert I. Goldberg is granted. Its motion to preclude the expert testimony of W. Alan Bullerdiek is denied, with the exception of Bullerdiek's opinion that the fireplace heater is defective because it did not come with a guard.

Vermont's motion for summary judgment on Colby and Donnelly's negligence, design defect, failure to warn, and breach of warranty claims is denied. Summary judgment is granted as to plaintiffs' manufacturing defect claims and Santoro's claims for negligent infliction of emotional distress, loss of consortium, and loss of services. Summary judgment is denied as to Santoro's claim for medical expenses. The Clerk of the Court is directed to close these motions [# s 55, 58, and 61 on the docket sheet].

15 (same); *McNally v. Addis,* 65 Misc.2d 204, 317 N.Y.S.2d 157 (N.Y.Sup.1970) ("[F]or a parent to recover such damages predicated upon the loss of services of a child, proof must be forthcoming establishing that the parent is not possessed of sufficient means to *support himself without the aid of his injured child* and that the expenses incurred by the parent has diminished his accumulated capital so as to reduce himself to a state of dependence."); *Mercurio v. State,* 33 Misc.2d 729, 227 N.Y.S.2d 372, 377–78 (1962) (mother of injured child permitted to recover for lost services where there was evidence that the children was working and contributing to the mother).

**212.** *Bailey v. Roat,* 178 Misc. 870, 36 N.Y.S.2d 465, 467 (1942); *Ballantine v. Ahearn,* 170 Misc. 651, 10 N.Y.S.2d 937, 938 (1939).

**213.** *See Stiles v. Caddick,* 11 A.D.2d 889, 203 N.Y.S.2d 484, 485 (3d Dep't 1960); *Becker v. Rieck,* 19 Misc.2d 104, 188 N.Y.S.2d 724, 726–27 (1959); *Natoli v. Board of Ed. of City of Norwich,* 101 N.Y.S.2d 128, 130 (1950); *Mercurio,* 227 N.Y.S.2d at 377–78.

**214.** *See Clough v. Board of Ed. of Spencerport Cent. Sch. Distr.,* 56 A.D.2d 233, 392 N.Y.S.2d 170, 173 (4th Dep't 1977).

SO ORDERED.